UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| NELDA SHARON PIPER | ) | Case No. 04-13066-SSM |
| | ) | Chapter 7 |
| Debtor | ) | |
| | ) | |
| DONALD F. KING, TRUSTEE | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 05-01556 |
| | ) | |
| NELDA SHARON PIPER, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**

This is an action by a chapter 7 trustee to avoid a conveyance of real property from

the debtor to herself and her husband as tenants by the entirety.  Although the court cannot

find that the transfer was done with actual intent to hinder, delay, or defraud creditors, the

court does find that the transfer may be avoided because it was made without consideration

deemed valuable at law.  This opinion constitutes the court's findings of fact and

conclusions of law under Rule 7052, Federal Rules of Bankruptcy Procedure, and Rule 52,

Federal Rules of Civil Procedure.

<u>Background</u>

The facts of this case are relatively straightforward.  Nelda Sharon Piper ("the

debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this

court on July 19, 2004.  On her schedules she listed $89,753 in unsecured debt.  Her only

significant asset consists of real property located at 38190 Stevens Road, Lovettsville,

Virginia, which she scheduled as being owned by her and her husband, John Clifton

Gallahan, as tenants by the entireties.  The market value of the home was shown as

$310,000, subject to two deeds of trust totaling $194,586, and a judgment lien in the amount

$7,731.[1]  The debtor claimed the property exempt under § 522(b)(2)(B), Bankruptcy Code.[2]

Donald F. King was appointed and is serving as the chapter 7 trustee in the debtor's case.

The debtor, who was then unmarried, purchased the property in December 1999, and

title was taken solely in her name.[3]  Prior to filing bankruptcy, Ms. Piper was an employee of

United Airlines and owned two small businesses which she operated as sole proprietorships.

After the events of September 11, 2001, she lost her job at United and her businesses began

to fail.  Soon she found herself in severe financial straits.  As a result of the loss of income

she began to fall farther and farther behind on her mortgage payments and her other

obligations to creditors, and by late 2002 she was facing collections and  foreclosure

proceedings.  In 2002, Ms. Piper tried to sell the house in order to get out of debt—which at

that time included approximately $20,000 to $25,000 in credit card bills—but was

unsuccessful in obtaining an offer for an amount sufficient to do so.  On March 3, 2003, one

---

[1]  At trial, the parties stipulated that the fair market value of the property as of June 24, 2003, was $275,000, and that the two deeds of trust had a balance on that date of $198,245.

[2]  The statutory provision was renumbered as a result of the amendments made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, and is now § 522(b)(3)(B).

[3]  The deed reflects a purchase price of $49,500.00.

2

creditor, Capital One Bank, obtained a judgment against her in Henrico County General

District Court in the amount of $7,786.97 for money owed on a credit card account.

During this time Ms. Piper had been dating Mr. Gallahan, whom she met in 1994 and

who was also employed by United Airlines.  Ms. Piper and Mr. Gallahan began living

together in the Stevens Road property sometime prior to January 2001.  Like Ms. Piper, Mr

Gallahan also lost his job following September 11, 2001.  In late 2002, however, he was

recalled to work at a salary of approximately $60,000 a year.  In light of this and Ms. Piper's

financial difficulties, the two decided to "pool their resources together."  In December of

2002, Mr. Gallahan began depositing his payroll check in Ms. Piper's bank account and on

January 1, 2003 the two were married.

Following their marriage the couple endeavored to catch up the mortgage payments,

which were then approximately three months behind.  The payments on the first deed of

trust were approximately $1,300 a month, and the payments on the second deed of trust were

in the range of $260 to $280 a month.  In addition to paying the mortgage, the money Mr.

Gallahan deposited in Ms. Piper's bank account was used to purchase groceries and clothing

and to pay other general household expenses.  By May of 2003, the mortgage had been

brought current.  The debtor testified that she and Mr. Gallahan thought of the property as

something that should be jointly owned because they were married and they were both

contributing to the payments.  She testified that she had initially undertook to have the

property jointly titled shortly after they were married, but could not find the existing deed to

have a new one prepared and could not obtain a copy for several months.  Ultimately,

however, a deed was prepared conveying the property from her to herself and Mr. Gallahan

3

as tenants by the entirety with the common law right of survivorship.  She signed the deed

on June 20, 2003, and it was recorded in the land records of Loudoun County on June 24,

2003.  The only consideration stated in the deed was $10.00.  Ms. Piper and Mr. Gallahan

stipulated that the transfer left Ms. Piper insolvent.  Mr. Gallahan did not expressly assume

the mortgage,[4] and there was no separate written agreement obligating him to contribute

money towards its payment.  Soon thereafter Mr. Gallahan's pay was significantly reduced

and the couple's financial outlook was once again dimmed.  Although Mr. Gallahan

continued to contribute what he could into Ms. Piper's account through January 2005, the

amounts were significantly reduced.   Ms. Piper testified that the total amount Mr. Gallahan

deposited into her bank account prior to the date the deed was recorded was $17,741, and

that since the deed was recorded until January 31, 2005, he had deposited an additional

$13,288.[5]

Mr. Gallahan is not contractually liable on the mortgage.  Ms. Piper testified that the

couple attempted on several occasions to refinance the property in their joint names but were

unable to do so, either because they were turned down on account of their poor credit history

or the interest rate of the new loan was greater than that of the current loan, which in turn

would force them to make a higher monthly payment.  The couple eventually gave up trying

---

[4]  The deed not only did not mention the two deeds of trust, but contained a covenant that
Ms. Piper had done no act to encumber the property.

[5]  The amount of the deposits varied considerably.  For the seven months leading up to the
recording of the deed, the deposits in any given month ranged from a low of $1,000 to a high
of $4,283, with the average being $2,534.  For the 18 months following the recording of the
deed (and excluding one month for which records are not available) the monthly amounts
ranged from a low of $0 to a high of $3,527, with the average being $749.

4

to refinance the mortgage.  After Ms. Piper filed for bankruptcy, Mr. Gallahan stopped

depositing money into her account to pay the mortgages because of concern that the trustee

would claim the house as part of the bankruptcy estate.

Discussion

I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and

the general order of reference from the United States District Court for the Eastern District

of Virginia dated August 15, 1984.  An action to avoid a fraudulent conveyance is a core

proceeding in which a final order or judgment may be entered by a bankruptcy judge.  28

U.S.C. § 157(b)(2)(H).  Venue is proper in this district under 28 U.S.C. § 1409(a).  The

defendants have been properly served and have appeared generally.

II.

The effect of the conveyance from the debtor to herself and her husband as tenants by

the entirety was to place the property—which at that time had approximately $76,700 in

equity— completely beyond the reach of her creditors, with the exception of those having

liens against the property.[6]   In Virginia, real property held as tenants by the entireties is not

liable for the debts of either spouse alone but can be reached only for their joint debts.

*Vasilon v. Vasilon*, 192 Va. 735, 66 S.E.2d 599 (1951).  None of the debts listed on the

debtor's schedules are joint debts.  As noted, the debtor filed her bankruptcy petition on July

19, 2004, and the transfer was perfected on June 24, 2003.  Since the transfer occurred more

---

[6]  Besides the mortgage company, only Capital One Bank (as a result of its judgment) had a
lien against the property.

5

than one year prior to the bankruptcy filing, it cannot be avoided under the Bankruptcy

Code's own fraudulent conveyance provision.  § 548(a)(1), Bankruptcy Code.[7]  A chapter 7

trustee may, however, take advantage of state fraudulent conveyance statutes in his capacity

either as a hypothetical judgment creditor or as successor to an actual creditor holding an

allowed claim. § 544, Bankruptcy Code.  Specifically,

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor ... that is voidable by–
>
> * * *
>
> (2) a creditor that extends credit to the debtor at the time of the commencement of the case and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists[.]
>
> * * *
>
> (b) ...the trustee may avoid an transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

In this connection, two Virginia statutes potentially allow for avoidance of the June 2003

transfer. Section 55-80, Code of Virginia, allows avoidance of transfers made with actual

intent to hinder, delay or defraud creditors,[8] while § 55-81 allows avoidance of voluntary

---

[7]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8 ("BAPCPA") extends the look-back period to two years before the filing of the petition, but only for bankruptcy cases commenced on or after April 20, 2006.

[8]  Section 55-80, Code of Virginia, provides as follows:

**§ 55-80. Void fraudulent acts; bona fide purchasers not affected**

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors,

(continued...)

6

transfers made without valuable consideration or on consideration of marriage if a debtor

was insolvent or became insolvent as a result of the transfer.[9]  Actions under § 55-81 are

subject to a five-year statute of limitations. § 8.01-253, Code of Virginia.  Actions under §

55-80 are subject only to laches.  *In re Massey*, 225 B.R. 887, 890 (Bankr. E.D. Va. 1998).

III.

The court will first address the fraudulent conveyance statute, § 55-80, Code of

Virginia.  As Judge Bostetter of this court explained in *Bartl v. Garfinkel*, 30 B.R. 199

(Bankr. E.D.Va. 1983):

> Section 55-80 of the Code declares as fraudulent any transfer of property
> made with intent to hinder, delay or defraud 'creditors, purchasers or other
> persons.' A purchaser for valuable consideration is protected only if he lacks
> 'notice of the fraudulent intent of his immediate grantor or of the fraud
> rendering void the title of such grantor.' Va. Code § 55-80 (1981 Repl. Vol).
> Actual knowledge of such facts and circumstances as would put a reasonable

---

[8](...continued)
> purchasers or other persons of or from what they are or may be lawfully entitled to shall,
> as to such creditors, purchasers or other persons, their representatives or assigns, be void.
> This section shall not affect the title of a purchaser for valuable consideration, unless it
> appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud
> rendering void the title of such grantor.

[9]  Section 55-81, Code of Virginia, provides as follows:

**§ 55-81. Voluntary gifts, etc., void as to prior creditors**

Every gift, conveyance, assignment, transfer or charge which is not upon consideration
deemed valuable in law, or which is upon consideration of marriage, by an insolvent
transferor, or by a transferor who is thereby rendered insolvent, shall be void as to
creditors whose debts shall have been contracted at the time it was made, but shall not, on
that account merely, be void as to creditors whose debts shall have been contracted or as
to purchasers who shall have purchased after it was made. Even though it is decreed to be
void as to a prior creditor, because voluntary or upon consideration of marriage, it shall
not, for that cause, be decreed to be void as to subsequent creditors or purchasers.

7

person on inquiry is sufficient. *Bank of Commerce v. Rosemary & Thyme, Inc.,* 218 Va. 781, 239 S.E.2d 909 (1978).

A claim of fraud must be proved by clear, cogent and convincing evidence. *Schreyer v. Platt,* 134 U.S. 405, 10 S.Ct. 579, 33 L.Ed. 955 (1890); *Land v. Jeffries,* 26 Va. (5 Rand.) 599 (1827; *McClintok v. Royall,* 173 Va. 408, 4 S.E.2d 369 (1939). However, the evidence may be, and generally will be circumstantial only. *Witz, Biedler & Co. V. Osburn,* 83 Va. 227, 2 S.E. 33 (1883). When the evidence demonstrates a *prima facie* case of fraud, it is then incumbent upon he who would sustain the validity of the transaction to establish its fairness. *Hutcheson v. Savings Bank of Richmond,* 129 Va. 281, 105 S.E. 677 (1921).

20 B.R. at 211–212. Judge Bostetter went on to note that "[i]n the absence of direct and positive testimony, there are many facts and circumstances which the law admits as marks or signs of fraud and from which fraudulent intent may be inferred." *Id.* at 212. These facts and circumstances are often referred to as "badges of fraud." They include: "(1) close relationship of the parties, (2) insolvency of the grantor, (3) pursuit of the grantor by his creditors at the time of the transfer, (4) want or inadequacy of consideration, and (5) retention of possession of the property by the grantor." *Id.* (citation omitted). These badges of fraud—and the facts and circumstances surrounding them—vary in their weight and persuasiveness. As the *Garfinkle* court stated, "relationships between the parties, by blood or affinity, calls upon the court for careful examination of the transaction, although the mere relationship itself is not a badge of fraud." *Id.* (citation omitted). In addition, the Supreme Court of Virginia has noted that "[i]t is well settled in a long line of Virginia cases, as a general rule, that transactions between husband and wife must be closely scrutinized to see that they are fair and honest, and not merely contrivances resorted to for the purpose of placing the husband's property beyond the reach of his creditors." *First National Bank of Bluefield v. Pressley*, 176 Va. 25, 29, 10 S.E.2d 526, 528 (1940).

8

That many of the traditional badges of fraud are present in this case can hardly be denied. The transfer was to the debtor and her husband; the transfer rendered her insolvent; at least one creditor was aggressively pursuing collection of its claim at the time; the debtor received no contemporaneous consideration for the transfer; and she remained in possession of the property following the transfer.   Thus there can be no doubt that the trustee has made out a prima facie case that the property was transferred with the intent to hinder, delay, or defraud creditors.   At the same time, the ultimate question remains one of the debtor's actual intent—that is, was the property deeded for the purpose of putting it beyond the reach of Ms. Piper's creditors?  Badges of fraud, while they raise a presumption of fraudulent intent, are not conclusive and are subject to rebuttal  *See Bartl v. Garfinkel*, 30 B.R. at 212.

In this connection, the debtor testified that she simply wanted to recognize her husband's financial contribution to the marriage and to do what most married couples do—that is, hold title to the marital residence jointly.  Joint ownership with right of survivorship holds a number of advantages for married couples besides protection against the claims of non-joint creditors.  In particular, in the event one of the spouses dies, title passes directly to the survivor without the cost and delay having to probate a will.  Although the timing of the deed is certainly suspicious—coming as it did shortly after one creditor obtained a judgment against Ms. Piper—it nevertheless followed reasonably soon upon the marriage.  In any event, having carefully considered the testimony in the light of the surrounding facts and circumstances, the court finds the debtor's explanation of the transfer to be straight-forward and credible.  Ms. Piper and her husband did no more than the vast majority of couples do when they are married, which is to place their residence in both of

their names.  In Virginia the usual means for married couples to own property jointly is as

tenants by the entireties.  In the absence of additional evidence or circumstances suggestive

of a plan or purpose to hinder, delay, or defraud creditors, the court is unable to find that the

debtor had such an intent when she retitled the property.  For that reason, the court

concludes that the transfer is not void under § 55-80.

IV

The trustee's alternate theory of recovery is founded under § 55-81, Code of Virginia.

This statute provides that a conveyance which renders the debtor insolvent and is made on

consideration of marriage or without consideration deemed valuable in law is void as to

existing creditors, although not as to future creditors.  To prevail under this theory, the

trustee must establish that he can step into the shoes of a creditor holding a valid claim prior

to the conveyance in question, *In re Yost,* 47 B.R. 697, 699 (Bankr. W.D. Va. 1985), and

must also prove that the transfer left the debtor insolvent and was made without

consideration deemed valuable in law. *In re Porter*, 37 B.R. 56, 65 (Bankr. E.D. Va. 1984).

Unlike § 55-80, application of § 55-81 is not dependent on a finding of an intent to hinder,

delay or defraud creditors; rather, the economics of the transaction are treated as working a

fraud on creditors, regardless of the debtor's actual intent. *Balzer & Assocs., Inc. v. Lakes on

360, Inc.*, 250 Va. 527, 531, 463 S.E.2d 453, 455–56 (1995) (explaining that "a transfer

undertaken by an insolvent debtor, or by a debtor who is thereby rendered insolvent, without

return to him of valuable consideration is *de jure* fraudulent as against any existing creditor

without any need to prove intent to defraud."); *Porter*, 37 B.R. at 66 ("[T]he purpose of the

statute is to avoid otherwise valid transactions under the principal that a debtor must be just

to his creditors before he is generous to his family and friends.").

In the present case it is undisputed that at least one creditor who existed on the date

of the bankruptcy petition had a valid claim against the debtor prior to the conveyance.

Capital One Bank had obtained a judgment against the debtor on March 3, 2003, some three

months prior to the conveyance in question.  The debtor also owed at the time approximately

$7,700 to Bank of America, $3,300 to Discover, and $7,800 to American Express on credit

cards.  Under § 544(b), Bankruptcy Code, the trustee can avail himself of any rights flowing

to these creditors.  *In re Yost*, 47 B.R. at 699.  Additionally, Ms. Piper concedes that the

transfer in question left her insolvent.  As such, the remaining issue to be resolved is whether

the transfer of real property was made without "consideration deemed valuable in law."


Ms. Piper and Mr. Gallahan contend that Mr. Gallhan provided adequate consideration

for the transfer by depositing his checks into Ms. Piper's account.  The total amount paid into

the account was over $30,000 (more than half of it before the deed was recorded). According

to the defendants, this should be construed as payment for fifty percent of the existing equity

in the property at the time of the transfer, thus constituting valuable consideration. The court

is unpersuaded by this argument.

Under general contract law, consideration consists of something (such as an act, a

forbearance, or a return promise) bargained for and received by a promisor from a promisee.

Black's Law Dictionary (8th ed. 2004);  *White v. Alleghany Mountain Corp.*, 159 Va. 394,

401–02, 165 S.E. 505, 507 (1932) ("A valuable consideration is said to be a benefit to the

11

party promising, or to a third person at his request, or an inconvenience, loss, or injury, or the

risk of it, to the party promised."); 3 *Williston on Contracts,* § 102 (4th ed.).  Generally, the

consideration given or promised need not be commensurate to the benefit received, as courts

do not concern themselves with the relative values exchanged or the wisdom of the contract.

*Jesse v. Smith*, 222 Va. 15, 17–18, 278 S.E.2d 793, 795 (1981) (stating that the general rule is

that parties to transactions are free to fix their own valuations, and courts will not inquire into

the adequacy of consideration).  Thus, under contract law, all that is required is that the

promisee must incur some detriment or provide some benefit to the promisor;  the value of

the detriment or benefit is of no importance.

While such an analysis may be appropriate where only the interests of the contracting

parties are at stake, it seems less appropriate when the transaction affects third parties, and in

particular, when it effectively deprives creditors of an asset that would otherwise be available

to satisfy their claims.  Put another way, existing creditors are plainly prejudiced if an

insolvent debtor is allowed to transfer valuable property for a pittance.  Although Virginia's

highest court does not appear to have ruled directly on the issue,[10] Federal courts applying

Virginia law have nevertheless rejected the argument that "consideration deemed valuable in

law" as used in § 55-81 requires a "balance sheet approach."  *C-T of Virginia, Inc. v. Euroshoe*

---

[10]  In *Chattin v. Chattin,* 245 Va. 302, 427 S.E.2d. 347 (1993)*,* the Court was faced with a
transfer of $268,000 by a husband—who at the time owed substantial amounts to his former
wife—to his paramour's corporation, so that the paramour could purchase a house. The
paramour was married at the time to someone else, and the husband testified that the
payment was made because the paramour "was giving up everything she had to join me and
in return for that and her love and affection and such that I would supply her with a home."
*Id*. at 310, 427 S.E. at 352.  The Court held that valuable consideration did not include a
promise to terminate an existing marriage, since such an agreement was contrary to public
policy and was void.  Unfortunately, the opinion does not go on to discuss whether a
different result would have been reached had the paramour not been married.

*Assocs. Ltd.*, 762 F. Supp. 675 (W.D. Va. 1991) (holding that new investment of $4 million

was sufficient consideration to support $30 million leveraged buy-out of existing

shareholders), *aff'd* 953 F.2d 637, 1992 WL 12307, *2 (4th Cir. 1992) ("We agree that § 55-81

does not require [the transfer of] reasonably equivalent value."); *accord In re Springfield*

*Furniture, Inc.*, 145 B.R. 520, 533 (Bankr. E.D. Va. 1993) (stating that "[t]he phrase

'consideration deemed valuable in law' refers to any valuable consideration received by the

transferor" and holding that employer received valuable consideration for payments to defined

benefit pension plan when employees performed services in exchange for their compensation

package, which included promise of retirement benefits). Accordingly, a creditor's attempt to set

aside a conveyance under § 55-81 will be thwarted if a debtor can prove that he received

consideration sufficient to support a simple contract. The question then becomes whether Ms.

Piper received consideration sufficient to support a contract.

The trustee does not dispute that Mr. Gallahan deposited over $30,000—much of which

was used to make payments on the two deeds of trust, and the remainder to pay other household

expenses—to Ms. Piper's checking account before and after the recording of the deed. What is

lacking, however, is any clear evidence that Mr. Gallahan's financial contributions to the

household were made in exchange for a promise to make him joint owner on the property. Not

only was there no writing to that effect, there was also no evidence of an explicit oral agreement.

All that appears from the testimony is that Mr. Gallahan contributed as he was able to the

household expenses, including the mortgage payments, either out of love and affection or a sense

of marital duty. Indeed, since he was actually living in the property at the time, the payments

were  very much in his own self-interest, since they went to maintain a roof over his head. As

13

noted, he never became contractually liable on the mortgage.  Nor were his deposits into the

checking account in a fixed amount or even always in an amount sufficient to make the mortgage

payments for that month.  Under the circumstances, the court can only construe the deposits either

as gifts to Ms. Piper or in satisfaction of the common-law duty of support recognized by Virginia

law.  *See Lawson v. Lawson*, 349 F. Supp. 203 (W.D. Va. 1972); *Bundy v. Bundy*, 197 Va. 795, 91

S.E.2d 412 (1956); *Catlett v. Alsop*, 99 Va. 680, 40 S.E. 34 (1901); *Alexander v. Alexander*, 85

Va. 353, 7 S.E. 335 (1888); *see generally* 9B *Michie's Jurisprudence,* p. 330 ("The duty of a

husband to support his wife is a moral as well as a legal obligation; it is a marital duty, in the

performance of which the public as well as the parties are interested; it is a duty which is an

incident to the marriage state and arises from the relation of the marriage . . .").   The payments,

to the extent they were made in satisfaction of the pre-existing obligation of support, would not

constitute independent consideration for the deeding of the property.  3 *Williston on Contracts*

§ 7:36 (4th ed.) (stating general rule that a promise to perform an existing legal or contractual

obligation is, without more, insufficient consideration to support a new contract); Restatement

(Second) of Contracts § 73.  For that reason, the court is unable to find from the evidence that Mr.

Gallahan's mere contribution to the household expenses constituted valuable consideration for the

deeding to him of a half-interest in the property.  The other requirements under § 55-81 having

been met, the court concludes that the transfer was void as to existing creditors of the debtor and

may be set aside by the trustee under § 544(b), Bankruptcy Code.

<u>Conclusion</u>

For the reasons stated above, the trustee has carried his burden with respect to Count II,

which seeks avoidance under § 55-81, Code of Virginia, and the court will set aside the transfer

14

of property to the debtor and her husband.  Count I, which seeks avoidance under § 55-80, Code

of Virginia, will be dismissed.  A separate judgment will be entered consistent with this opinion.

Date: _____            _____
                                         Stephen S. Mitchell
Alexandria, Virginia                     United States Bankruptcy Judge


Copies to:

James W. Reynolds, Esquire
Odin, Feldman & Pittleman, P.C.
9302 Lee Highway, Suite 1100
Fairfax, VA  22031
Counsel for the plaintiff

Nancy Ryan, Esquire
Law Offices of Robert Ross Weed
1420 Prince Street, Suite 200
Alexandria, VA  22314
Counsel for the defendants